# EXHIBIT A

STATE OF MINNESOTA                                    DISTRICT COURT

COUNTY OF HENNEPIN                           FOURTH JUDICIAL DISTRICT

---

Bryan Oliver,                                  Court File No. _____

              Plaintiff,

v.                                                **SUMMONS**

Honeywell International Inc.

              Defendant.

---

THIS SUMMONS IS DIRECTED TO DEFENDANT HONEYWELL INTERNATIONAL INC.:

1. **YOU ARE BEING SUED.** The Plaintiff has started a lawsuit against you. The Plaintiff's Complaint against you is attached to this Summons. Do not throw these papers away. They are official papers that affect your rights. You must respond to this lawsuit even though it may not yet be filed with the Court and there may be no court file number on this Summons.

2. **YOU MUST REPLY WITHIN 21 DAYS TO PROTECT YOUR RIGHTS.** You must give or mail to the person who signed this Summons a **written response** called an Answer within 21 days of the date on which you received this Summons. You must send a copy of your Answer to the person who signed this Summons located at:

   > BAILLON THOME JOZWIAK & WANTA LLP
   > 100 South Fifth Street, Suite 1200
   > Minneapolis, MN 55402

3. **YOU MUST RESPOND TO EACH CLAIM.** The Answer is your written response to the Plaintiff's Complaint. In your Answer you must state whether you agree or disagree with each paragraph of the Complaint. If you believe the Plaintiff should not be given everything asked for in the Complaint, you must say so in your Answer.

4. **YOU WILL LOSE YOUR CASE IF YOU DO NOT SEND A WRITTEN RESPONSE TO THE COMPLAINT TO THE PERSON WHO SIGNED THIS SUMMONS.** If you do not Answer within 20 days, you will lose this case. You will not get to tell your side of the story, and the Court may decide against you and award the Plaintiff everything asked for in the Complaint. If you do not want to contest the claims stated in the Complaint, you do not need to respond. A default judgment can then be entered against you for the relief requested in the Complaint.

5. **LEGAL ASSISTANCE.** You may wish to get legal help from a lawyer. If you do not have a lawyer, the Court Administrator may have information about places where you can get

1

legal assistance. **Even if you cannot get legal help, you must still provide a written Answer to protect your rights or you may lose the case.**

6. **ALTERNATE DISPUTE RESOLUTION.** The parties may agree to or be ordered to participate in an alternative dispute resolution process under Rule 114 of the Minnesota General Rules of Practice. You must still send your written response to the Complaint even if you expect to use alternative means of resolving this dispute.

Dated: August 26, 2021

*s/ Jerri C. Adams Belcher*
Jerri C. Adams Belcher
Bar No. 396352
Christopher D. Jozwiak
Bar No. 386797
*Attorneys for Plaintiff*
BAILLON THOME JOZWIAK & WANTA LLP
100 South Fifth Street, Suite 1200
Minneapolis, MN 55402
Telephone: (612) 252-3570
Fax: (612) 252-3571
jcbelcher@baillonthome.com
cdjozwiak@baillonthome.com

2

STATE OF MINNESOTA                    DISTRICT COURT

COUNTY OF HENNEPIN         FOURTH JUDICIAL DISTRICT

---

Bryan Oliver,                        Court File No. _____

          Plaintiff,

                                **COMPLAINT AND**
v.                                  **JURY DEMAND**

Honeywell International Inc.

          Defendant.

---

The Plaintiff, Bryan Oliver, for his Complaint against Defendant, states and alleges as follows:

### PARTIES, JURISDICTION & VENUE

1.      Plaintiff is a natural person who resides in the City of Shorewood, County of Hennepin, State of Minnesota.

2.      Defendant Honeywell International Inc. ("Defendant" or "Honeywell") is a Delaware corporation headquartered in Charlotte, North Carolina.

3.      At all times relevant to this action, Plaintiff and Defendant were "employee" and "employer," respectively, within the meaning of Minn. Stat. § 181.932.

4.      The Court has personal jurisdiction over the parties because Plaintiff is domiciled in Minnesota, Defendant conducts business in Minnesota, and the alleged unlawful employment actions at issue occurred in Minnesota.

5.      Venue is proper in Hennepin County pursuant to Minn. Stat. § 542.09. Plaintiff worked for Defendant in the County of Hennepin, State of Minnesota, and the unlawful acts alleged herein occurred in the County of Hennepin, State of Minnesota.

# FACTS

6.      Plaintiff obtained his Ph.D. from Iowa State University with a concentration in microelectronics device physics and fabrication. Plaintiff first began working at Honeywell on October 3, 2011 and transferred to Honeywell Labs—Advanced Technology in Plymouth, Minnesota in the fall of 2014.

7.      Plaintiff's work ethic and ability were immediately noticed. In his 2014 performance review, Plaintiff's manager Robert Carlson ("Carlson") noted that Plaintiff "dug into Pegasus issues and brought the tool around to as good as new. [It was a]n impressive first test of his ability and style." Carlson also stated Plaintiff had a "[g]ood communications style."

8.      Plaintiff's dedication to Honeywell's success was quantifiable, as he regularly put in 60-70 hours of work each week, if not more. Plaintiff's supervisors noticed his dedication, noting in his 2016 performance review that Plaintiff "[w]orks very long and odd hours to get more time on lab tools. Responds after hours, came in from vacation to fix Ion Mill for ISC."

9.      A key party of Plaintiff's duties was to understand the requests of design engineers, and if Plaintiff deemed the requested product as feasible, to develop a process to reflect the requested dimensions, tolerances, and geometric shapes, and, most importantly, make sure the process was repeatable with low-sigma across the wafer and wafer-to-wafer.

10.     At the start of employment, Honeywell employees in positions such as Plaintiff's were required to complete an Intellectual Property Protection training, which was done online. The training outlined that some intellectual property is held on a "Need to Know" basis, meaning it should only be shared with necessary individuals in order to prevent the dissemination or theft of proprietary information.

2

11.     Plaintiff was also required to submit a National Security Authorization Questionnaire to the federal government in order to work at Honeywell on potentially classified projects. After his authorization was approved, Plaintiff signed a nondisclosure agreement between himself and the United States government.

12.     Notably, Plaintiff's training did not include OSHA High Voltage Electrical Safety training before he started working to fix the Deep Reactive Ion Etch ("DRIE") Pegasus system and the Ion Beam Etch system. This would have been a refresher course for Plaintiff and is typically recommended by OSHA every few years. Plaintiff felt that since more than 10 years had passed since his last refresher training, it was necessary to take this training again. Honeywell never provided this training.

13.     Plaintiff did meaningful work for Honeywell during his time there, such as helping manufacturing resolve massive yield problems and processing inefficiencies, and mentoring engineers locally, Texas, and Washington on how to optimize processes for low-sigma variations and keeping maintenance of the chamber a high priority.

14.     Plaintiff was able to save Honeywell and estimated $1.5 million on *one* project by identifying how to control and contain its processes. This project, Pegasus DRIE, was very close to being deemed a complete loss until Plaintiff came in.

15.     Furthermore, this DRIE wafer process system, initially created by SPTS ("SPTS"), was fixed by Plaintiff's expertise and guidance, after years of SPTS attempting to fix it itself. The Pegasus DRIE was now capable of fabricating new processes that delivered unique fabrications with deeper etched trenches, smaller lateral dimensions, and better sigma control than ever previously possible.

16.     Plaintiff's success with DRIE allowed designers to enhance the sensitivity of critical devices at the very heart of wafer builds used in numbers Honeywell program contracts, including DARPA, the Department of the U.S. Army, and others, in addition to ongoing manufacturing wafer builds that go to Honeywell-Minneapolis for further work. With the cost savings, this one project likely resulted in tens of millions of dollars of profit for Honeywell.

17.     In mid-2016, design engineers from Honeywell Aerospace requested a wafer processing design from Plaintiff's process group-- which they immediately began developing. This design request was to meet objectives for a contract project coming from Defense Advanced Research Projects Agency ("DARPA"), a part of the Department of Defense. This project, PRIGM-TIGM, was a long-term, multi-million-dollar contract which was awarded to Honeywell on a non-compete basis.

18.     While the end result product of the wafer processing is shared with design engineers, the state-of-the art processes and parameters used to create the wafer are closely held by the process group due to the sensitivity of the information.

19.     Plaintiff put significant effort into building rapport with the design group, inviting them to come to his lab to show them how he monitors the process and how he evaluates the result when the process experiment is completed. Only one design engineer ever took him up on this offer when they met once for less than an hour.

20.     Despite his efforts, the design engineers who did interact with Plaintiff were often condescending and rude to him, as well as to the rest of Plaintiff's team.

21.     In an effort to deescalate the tension between Plaintiff and the design team, Plaintiff invited his manager, Robert Carlson ("Carlson"),to join their weekly meetings. Even though

Carlson's office was a mere three feet away from where these meetings were held, he never came to a meeting, instead choosing to go to lunch at this time.

22.    Around this time, several design engineers approached Plaintiff, on multiple occasions, asking him to provide sensitive information regarding the wafer process parameters for fabrication of the heart of the device. Plaintiff refused, at which point the asking turned to badgering.

23.    Understanding this information to be a trade secret, Plaintiff consulted with his manager, Carlson, who steadfastly stated that he agreed in not allowing the sensitive details to be disseminated to those not in a "Need to Know" situation.

24.    About a week later, Plaintiff was informed by Carlson that he had consulted with the director, Earl Bensor ("Bensor") as to whether Plaintiff should share this information. Carlson stated that Bensor agreed that the design engineers were not on a "Need to Know" basis regarding this information and not to provide it to them. Plaintiff agreed and continued to refuse the design engineers' requests.

25.    As a result of Plaintiff's refusal, he was subjected to further insults and was often berated by these employees. At one point, Plaintiff asked if the reason they were looking for the specific process parameters was to scope out potential wafer foundries outside of Honeywell. The design engineers adamantly denied this was their intent and never admitted to the truth.

26.    Plaintiff reported this hostile environment to Carlson, but Carlson took no action.

27.    In September 2016, feeling it necessary due to the confidentiality of the information being demanded from him, Plaintiff contacted the Intellectual Property Protection lawyer for the Honeywell Labs organization, who is based in Washington, D.C. The telephone conversation lasted around 100 minutes in total.

5

28.     Shortly thereafter, Plaintiff was contacted by the Plymouth Human Resources Manager, Anne Holoch ("Holoch"), going against the promise of anonymity made by Honeywell in literature regarding the reporting of valid concerns to the person that can help. However, based upon his conversations with Holoch, it was clear that the details of Plaintiff's previous protected report were shared with her.

29.     Soon, Plaintiff stopped attending the meetings with the design engineers as his ideas were blatantly ignored.

30.     Carlson told Plaintiff that he was having discussions with Director Benson and the Design Manager, Gordon Rouse, about the riff that had occurred between the PRIGM-TIGM design engineers and Plaintiff. Plaintiff was never invited to such discussions, but it was apparently decided that the design team was entitled to some of the process parameters. Plaintiff was never told why such a change occurred.

31.     Concerned about safeguarding of Honeywell's intellectual property, Plaintiff wanted more insight into why the design engineers were demanding information regarding a process they would not likely understand, given that the information was outside of their spheres of expertise.

32.     In the PRIGM-TIGM folder, to which Plaintiff had been granted access, Plaintiff discovered the reason. The design team was, in fact, scoping out wafer foundries for high-volume manufacturing. The decision to outsource such production is not an unreasonable one, but Plaintiff felt it was inappropriate for the design team to hide such a decision from the process team members. Due to the design team's lack of knowledge about high-volume wafer manufacturing, such a decision would require successful transfer and end-product results.

33.     When Plaintiff looked further into what companies the design team was considering, he was extremely concerned.

34.     Of the top five "finalists," two jumped out at Plaintiff as being particularly troublesome. The first was a company owned by a former DARPA official and someone the design manager knew well.  The Honeywell Code of Business Conduct explicitly states: "[Y]ou should never be involved with or attempt to influence the bidding, negotiating, or contracting process between . . . a close friend and Honeywell." HONEYWELL INTERNATIONAL, CODE OF BUSINESS CONDUCT 20 (2011).

35.     Plaintiff knew that this "foundry" the design team was considering was not a foundry at all, but a mere office and lab space with some wafer processing equipment, but not nearly enough to be capable of the high-volume manufacturing required by this potential contract.

36.     Another Honeywell employee who had been to the site of this "foundry" confirmed Plaintiff's concerns.

37.     Further, this foundry was associated with the University of Michigan, which would allow the wafers to be produced, in whole or in part, in a lab at the University. This concerned Plaintiff more, as he felt it would be incredibly difficult to keep the wafer process confidential in such an environment.

38.     The second foundry candidate Plaintiff found problematic is known as Silex Microsystems ("Silex"). The foundry, based in Stockholm, Sweden, is seemingly a promising option as it is the largest pure MEMS wafer foundry in the world. However, in 2015, Silex was acquired by a corporation based in Hong Kong, who purchase a number of technology companies around this same time.

7

39.     After a simple Google search, Plaintiff found that this corporation was in fact a shell corporation owned and operated by the Chinese government. As the project was funded by the United States Department of Defense, Plaintiff was extremely concerned that outsourcing to Silex would result in the Chinese government gaining access to information and processes that would potentially threaten our own national security.

40.     At one point, Plaintiff asked Carlson if he was aware that the design team was considering taking the process that Plaintiff invented to an outside foundry. Carlson stated he had no idea that was the plan. Plaintiff then expressly stated his concern about allowing this process to be known outside of Honeywell without proper trade secret protection. Plaintiff also worried that outside foundries could not ensure consistency wafer-to-wafer as he would be able to do at Honeywell.

41.     In addition to reporting these suspect requests for information, Plaintiff repeatedly reported retaliation as a result of his refusal to share the process specifics. Carlson repeatedly ignored Plaintiff's concerns.

42.     For example, Plaintiff's name was left off the list of people credited with working on the DARPA project, PRIGM-TIGM. This document was the quarterly report submitted to DARPA by the Honeywell design engineer who was the principal engineer on the project, and would be seen by high-level DARPA officials, high-level customers of DARPA, and high-level management across Honeywell. For PhDs in science and engineering, named credit is extremely important, especially regarding the critical device processing.

43.     Initially, the entire process team's names were left off the list. When Plaintiff reported this discrepancy to Carlson to ensure the process team received proper credit, all of their names were added *except* Plaintiff's.

8

44.     This was not a one-time mistake, as Plaintiff's named credit was missing in each subsequent DARPA PRIGM-TIGM report.

45.     Plaintiff reported this to Carlson on March 10, 2018, but again, no action was taken. Despite this, Plaintiff continued to work on the DARPA PRIGM-TIGM project, developing DRIE processes and maintaining consistency with low sigma to help ensure Honeywell's success in winning the bid.

46.     To ensure the successful fabrication of their device, Plaintiff suggested to the design team the implementation of Design Rules for MEMs fabrication. Design Rules for MEMs are used in wafer foundries around the world. The design engineers had even spoke when a potential foundry that told them that utilizing the Design Rules was required. Plaintiff even worked with a process technician to put together a plan, but his advice was ignored.

47.     After informing his group manager of the design team's neglect of this project, Plaintiff was told that he no longer had to work on this DARPA-funded project any longer.

48.     Plaintiff received another positive performance review in March 2017. He was told he was the highest performing engineer in his group and is creative, gifted and talented, consistently striving for excellence, and worked well with his teammates. Despite surpassing the requirements to be promoted, Carlson told Plaintiff he was not going to be promoted because he "complained too much."

49.     Throughout April and May of 2017, Plaintiff met with the then-Plymouth HR manager Heather Besikof ("Besikof") approximately three times in her office to discuss Plaintiff's protected reports.

9

50.     On or about May 10, 2017, Plaintiff had a meeting with Besikof to discuss his previous reports and other ongoing misconduct. Beiskof told Plaintiff that she would further investigate his reports by talking to the design engineers who had previously mistreated him.

51.     During these meetings, Plaintiff also reported his suspicion of quotation manipulation by Honeywell employees. Plaintiff was assigned to work with another employee, Frank Pream ("Pream"), to gather quotations for suitable semiconductor equipment suppliers for a new wafer process system to etch on silicon dioxide wafers. Pream, however, avoided working with Plaintiff, which soon became detrimental to the success of the project, as it was clear Pream did not have a true understanding of the equipment he was tasked with sourcing.

52.     Pream first requested Oxford Instruments ("Oxford") to present on their etching process. However, during the course of this presentation, Plaintiff learned that Oxford's process system had not been used for silicon dioxide etchings before, besides to prepare a work product sample for the presentation itself.

53.     Notably, Oxford's sample given to Honeywell was poor quality and considerably worse than what other suppliers were offering.

54.     Oxford's sales manager offered Honeywell a ten percent discount off the normal purchase price of $1.5 million, for a total of $1.35 million.

55.     Pream also received a quotation from SPTS, which did have the correct process system and were well known for their work in making these systems. SPTS quoted Honeywell with a standard purchase price of $1.9 million with a customer discount making the total $1.65-1.7 million.

56.     The final quote Honeywell received was from Ulvac. Ulvac's regional sales manager, Ray Burghard ("Burghard"), and the scientist who designed this system presented to

both the Plymouth and Redmond teams. Of note, Carlson did not attend this presentation due to a personal conflict with the Redmond office.

57.    Ulvac quoted Honeywell $900,000.00, considerably lower than the other quotations. A significant reason for the difference in prices was because Ulvac's system did not include superfluous hardware included in the other systems, such as a robot arm and additional vacuum pumping systems.

58.    The very next day, Oxford submitted another bid, lowering their price another $350,000. Oxford also offered to include some parts for a different system owned by Honeywell for free.

59.    The same day, SPTS also slashed their quoted price to $1.4 million.

60.    Despite Carlson having previously emphasized the importance of penny pinching and how unnecessary superfluous equipment was, he forced the decision to go with Oxford, without using the Honeywell six-sigma team approach. As Oxford's system capability was questionable *and* more expensive than Ulvac's quote, Dr. Oliver thought this was a highly unethical decision.

61.    During one of Plaintiff's last meetings with Beiskof, Beiskof informed Plaintiff that she would have to inform Bensor of the details of their meetings. Plaintiff pushed back, explaining to her that he believed if she told Bensor about their discussions, he would force her *not* to investigate, as he was implicated in Plaintiff's report of retaliation.

62.    About a week or two later, Plaintiff followed up with Beiskof via email to inquire about the status of her investigation. Beiskof responded that she would not be investigating these issues nor speaking to anyone accused of retaliating.

63.     Plaintiff then responded, expressing his intent to bring his concerns to the Beiskof's supervisor, or the boss above her, as it appeared his reports were not being taken seriously.

64.     On June 1, 2017, Plaintiff contacted the Honeywell anonymous hotline via email to escalate his reports, copying Beiskof. Plaintiff explained that the site HR manager had said she would follow up with an investigation but did not after speaking to Bensor.

65.     Bill Humphrey ("Humphrey"), a special investigator based at the then-corporate headquarters in New Jersey, responded to schedule a Skype meeting with Plaintiff for the following week.

66.     Plaintiff, Humphrey, and Landry Hourtienne, an HR manager based in Coon Rapids, MN, all attended this Skype meeting. On information and belief, Humphrey recorded this Skype meeting.

67.     From the start of the meeting, Humphrey talked over Plaintiff and dismissed his reports of ongoing retaliation, suggesting the retaliation issue had been resolved.

68.     Plaintiff tried to explain that the retaliation was ongoing but was not able to get more than a few words in over Humphrey.

69.     Plaintiff then reported the suspicious quotation manipulation—specifically that two suppliers cut prices significantly the day before Honeywell was to make a decision—which appeared to be news to Humphrey. Plaintiff explained he believed someone inside Honeywell had given secret pricing information to the suppliers' sales representatives.

70.     Despite Humphrey being more willing to listen to these reports, he did not take down the names of the suppliers' sales representatives to investigate further, and the meeting ended after approximately an hour.

71.     Within a few weeks of this Skype meeting, Beiskof, the HR manager Plaintiff initially made his reports to, had left—her office empty and her company email inactive.

72.     Sometime around mid-July 2017, Jenni Strabley ("Strabley") approached Plaintiff in the hallway to advise him to tone down his reports or stop making them altogether.

73.     Strabley and Plaintiff had worked together in the past on a different DARPA project, for which Plaintiff was properly credited. As such, Plaintiff felt Strabley was advising him of this because she valued his work at Honeywell.

74.     On August 7, 2017, Plaintiff was terminated and presented with a separation agreement.

75.     After turning in his work computer, Plaintiff was quickly and quietly escorted from the building and was not allowed to gather his personal effects from his office, even with supervision.

76.     The following day, a Honeywell employee, Mia Bradley, falsely claimed she had seen Plaintiff in the building without authorization. As a result, security personnel and an equipment technician made a physical search of the building, making other employees aware of the reason for their search, further damaging Plaintiff's reputation.

77.     As of September 5, 2017, Plaintiff had yet to receive his personal belongings.

## COUNT I
## RETALIATION IN VIOLATION OF THE
## MINNESOTA WHISTLEBLOWER ACT
### Minn. Stat. § 181.932.

Plaintiff re-alleges all preceding paragraphs of this Complaint.

78.     Plaintiff, in good faith, made reports to Defendant of violations, suspected violations, or planned violations of state and federal laws, or common law and rules adopted pursuant to law including but not limited to:

13

a. Repeated breaches of Honeywell's duty of confidentiality to the United States government;

b. Potential breaches of nondisclosure agreements with the United States government;

c. Failure to cure organizational conflicts of interest pursuant to DARPA Instruction No. 70; and

d. Reports of retaliation in violation of the Minnesota Whistleblower Act.

79.     Plaintiff, in good faith, refused to participate in violations of law and regulations adopted pursuant to law.

80.     As a result of his reports and refusal to participate in violations of law and regulations adopted pursuant to law, Plaintiff was retaliated against in violation of the Minnesota Whistleblower Act, Minn. Stat. § 181.932. These actions were performed by Defendant with malice and/or reckless disregard for the rights of Plaintiff

81.     Plaintiff reasonably believed, in good faith, that Defendant violated state or federal law or rules or regulations adopted pursuant to law.

82.     In violation of the MWA, Defendant terminated Plaintiff because of his good faith reports and refusal.

83.     As direct and proximate result of Defendant's conduct, Plaintiff has suffered and continues to suffer economic harm, loss of wages and benefits, emotional distress, humiliation, embarrassment, pain and suffering, loss of wages and benefits, and other serious damage.

**PRAYER FOR RELIEF**

Therefore, Plaintiff requests that judgment be entered against Defendant for the following:

a.     Declaring that Defendant's acts or omissions described in this Complaint constitute violations of applicable federal and state laws which protect Plaintiff;

14

b.   Enjoining Defendant and its employees, officers, directors, agents, successors, assignees, affiliates, merged or acquired predecessors, parent or controlling entities, subsidiaries and all other persons acting in concert or participation with it, from its unlawful acts;

c.   Requiring Defendant to make Plaintiff whole for its adverse, retaliatory, and discriminatory actions with compensatory damages and with interest of an appropriate inflation factor;

d.   Awarding Plaintiff front pay and monetary value of any employment benefits she would have been entitled to as an employee for Defendant;

e.   Awarding Plaintiff attorneys' fees, costs, and disbursements pursuant to statute; and

f.   Granting other and further relief as the Court deems fair and equitable.

PLAINTIFF DEMANDS TRIAL BY JURY ON ALL COUNTS.


Dated: August 26, 2021          *s/ Jerri C. Adams Belcher*
                                Jerri C. Adams Belcher
                                Bar No. 396352
                                Christopher D. Jozwiak
                                Bar No. 386797
                                *Attorneys for Plaintiff*
                                BAILLON THOME JOZWIAK & WANTA LLP
                                100 South Fifth Street, Suite 1200
                                Minneapolis, MN 55402
                                Telephone: (612) 252-3570
                                Fax: (612) 252-3571
                                jcbelcher@baillonthome.com
                                cdjozwiak@baillonthome.com

ACKNOWLEDGMENT

The undersigned hereby acknowledges that costs, disbursements, and reasonable attorney's fees may be awarded pursuant to Minn. Stat. § 549.211 to the party against whom the allegations in this pleading are asserted.

Dated: August 26, 2021                    *s/ Jerri C. Adams Belcher*
                                          Jerri C. Adams Belcher